PER CURIAM:
 

 ¶ 1 Alexander L. Bednar (Respondent) is a member of the Oklahoma Bar Association (Bar) and is licensed to practice law in Oklahoma. The Bar initiated this action under Rule 6 of the Rules Governing Disciplinary Proceedings (RGDP), 5 O.S.2011, ch.1, app. 1-A, by filing an eleven-count Complaint on December 21, 2017. Respondent did not respond to the Complaint or to the Bar's Motion to Deem Allegations Admitted. The Professional Responsibility Tribunal (Trial Panel) deemed the allegations admitted and after a two-week trial found Respondent violated the Oklahoma Rules of Professional Conduct (ORPC) 1.1, 1.3, 1.4, 1.5, 1.15, 1.16(d), 3.1, 3.2, 3.3, 3.4, 4.2, 4.4, 8.1(b), 8.2(a), 8.4(c)-(d), 5 O.S.2011, ch. 1, app. 3-A, and RGDP 1.3 and 5.2. The Trial Panel recommended Respondent be permanently disbarred and ordered to pay the costs of the proceedings.
 

 I. STANDARD OF REVIEW
 

 ¶ 2 The Supreme Court of Oklahoma possesses original, exclusive, and nondelegable jurisdiction to control and regulate the practice of law, licensing, ethics, and discipline of attorneys. 5 O.S.2011, § 13 ; RGDP 1.1;
 
 State ex rel. OBA v. Braswell
 
 ,
 
 1998 OK 49
 
 , ¶ 6,
 
 975 P.2d 401
 
 , 404. The purpose of our licensing authority is not to punish the offending lawyer but to safeguard the interests of the public, the courts, and the legal profession.
 
 State ex rel. OBA v. Friesen
 
 ,
 
 2016 OK 109
 
 , ¶ 8,
 
 384 P.3d 1129
 
 , 1133. To determine whether discipline is warranted and what sanction, if any, is to be imposed, the Court conducts a full-scale, nondeferential,
 
 de novo
 
 review of all relevant facts.
 
 State ex rel. OBA v. Schraeder
 
 ,
 
 2002 OK 51
 
 , ¶ 5,
 
 51 P.3d 570
 
 , 574.
 

 ¶ 3 While accorded great weight, the report and recommendations of the Trial Panel are merely advisory in nature and carry no presumption of correctness.
 
 State ex rel. OBA v. Boone
 
 ,
 
 2016 OK 13
 
 , ¶ 3,
 
 367 P.3d 509
 
 , 511 ;
 
 State ex rel. OBA v. Anderson
 
 ,
 
 2005 OK 9
 
 , ¶ 15,
 
 109 P.3d 326
 
 , 330. Likewise, the specific rule violations listed in the complaint do not limit our discretion.
 
 See
 

 State ex rel. OBA v. Bedford
 
 ,
 
 1997 OK 83
 
 , ¶ 15,
 
 956 P.2d 148
 
 , 152. The ultimate decision-making authority rests with this Court.
 
 Anderson
 
 ,
 
 2005 OK 9
 
 , ¶ 15,
 
 109 P.3d at 330
 
 .
 

 II. PRIOR DISCIPLINE
 

 ¶ 4 On April 2, 2013, we suspended Respondent's license to practice law for one (1) year under RGDP 7.7.
 
 See
 

 State ex rel. OBA v. Bednar (Bednar I)
 
 ,
 
 2013 OK 22
 
 ,
 
 299 P.3d 488
 
 . The reciprocal disciplinary proceeding resulted from Respondent's voluntary resignation from the United States District Court for the Western District of Oklahoma pending disciplinary proceedings and his one-year suspension from the United States Court of Appeals for the Tenth Circuit.
 
 Id.
 
 ¶¶ 5, 16,
 
 299 P.3d at 490, 492
 
 . In that proceeding, we found Respondent engaged in witness intimidation, discovery abuse, threatening retaliatory lawsuits, a pattern of missing deadlines, improperly seeking reconsideration after adverse rulings, and fraudulent alteration of court documents, the last of which resulted in a $20,000 sanction.
 
 Id
 
 . ¶¶ 5, 12,
 
 299 P.3d at 490-91
 
 .
 

 ¶ 5 In
 
 Bednar I
 
 , Respondent submitted evidence of a recent ADHD diagnosis as mitigation.
 
 Id.
 
 ¶ 6,
 
 299 P.3d at 491
 
 . Respondent assured the Trial Panel then that he would continue taking prescribed medications and participating in therapeutic counseling to manage his impulsive behaviors affecting his practice of law. Complaint ¶ 155. After a hearing to determine if the matter should be treated as an RGDP 10 proceeding, which would assess his personal capacity, the Court found that Respondent's diagnosis did not alleviate him of personal responsibility.
 
 Bednar I
 
 ,
 
 2013 OK 22
 
 , ¶¶ 9, 14-15,
 
 299 P.3d at 491
 
 . Declining to convert the prior discipline to RGDP 10, we did not require proof of any continuing treatment from Respondent. Instead, we specifically noted that the treatment he was receiving did not appear to curb his impulsive behaviors.
 
 Id
 
 . ¶ 14,
 
 299 P.3d at 492
 
 . On July 30, 2014, Respondent filed his affidavit of reinstatement without order pursuant to RGDP 11.8.
 

 III. CURRENT DISCIPLINARY PROCEEDINGS
 

 A. Allegations Deemed Admitted
 

 ¶ 6 In response to grievances filed by former clients, the Bar investigated Respondent and on December 21, 2017, filed a formal Complaint setting forth eleven (11) counts of professional misconduct. In substance, these counts allege Respondent engaged in abusive discovery tactics, misrepresentations to courts, forgery of court documents, misappropriation of client funds, unauthorized contacts with opposing parties, a pattern of missing deadlines, untimely and improper motions for recusal, and retaliatory and frivolous lawsuits.
 

 ¶ 7 The Bar submitted evidence that Respondent was properly served with notice of the Complaint. On December 21, 2017, the Bar mailed copies of the formal Complaint to Respondent's official roster address and residence; Respondent signed for one copy on January 6, 2018. The Bar also hired a process server who served Respondent with the
 Complaint on January 10, 2018. In each of these notices, the Bar included a letter advising Respondent that RGDP 6.4 "requires an answer to be filed on your behalf with the Chief Justice within twenty (20) days of today's date[, and i]n the event you do not answer within twenty (20) days, the charges shall be deemed admitted." The Bar also enclosed copies of relevant documents serving as the bases for the grievances so that Respondent could review and address them in his response.
 

 ¶ 8 Respondent did not file an answer to the Complaint. Instead, he filed numerous "special appearance[s]," requests for recusal, subpoenas duces tecum, and other motions. With no timely answer from Respondent, the Bar filed a Motion to Deem Allegations Admitted on January 31, 2018. At the Scheduling Conference the same day, the Trial Panel said it would take the motion under advisement, explaining to Respondent that although he was out of time, it still believed an answer to the allegations would be "of great value to the Court." Sched. Conf. Tr. 116-17, Jan. 31, 2018. Although Respondent appeared at the Scheduling Conference and filed many motions, at no time did he file an answer to the Complaint or to the Motion to Deem Allegations Admitted.
 

 ¶ 9 After taking the motion under advisement for over two months, the Trial Panel issued an order on April 3, 2018, deeming the allegations of the Complaint admitted, pursuant to RGDP 6.4.
 
 [1]
 
 At the Pre-Trial Conference Hearing on April 16, 2018, the Trial Panel reiterated to Respondent that the allegations had been deemed admitted. There, and many times throughout the proceedings, the Trial Panel explained that it would hear evidence regarding the material elements of the Complaint and then, assuming those elements were established, evidence regarding appropriate discipline. Despite these notices, the transcripts reveal that Respondent spent much of the evidentiary hearing re-litigating already decided or irrelevant issues, such as his 2013 discipline.
 
 [2]
 
 After the hearing, the Trial Panel found clear and convincing evidence for ten (10) of the eleven (11) counts and concluded, "without the slightest reservation or hesitation[,] Respondent is unfit in all respects to be licensed as an attorney." Trial Panel Rep. 12.
 

 B. Due Process Allegations
 

 ¶ 10 Respondent alleges the investigative process was "fraught with procedural and substantive due process violations," claiming: the grievances lacked specificity; the Bar was biased against him; and the Trial Panel improperly deemed the allegations admitted, quashed subpoenas, refused to issue a new Scheduling Order, and declined to recuse its Presiding Master. Resp't's Br. 7-10. The Bar contends that Respondent was afforded "every opportunity to participate" in the fact-finding stages of the proceedings, yet chose not to fully avail himself of those opportunities - as evidenced by his failure to respond to the Complaint or Motion to Deem Allegations Admitted, refusal to submit an exhibit or witness list even after being granted extensions, and decision to wait seven weeks after the Scheduling Order to issue over thirty (30) subpoenas, almost all of which were improperly served and sought primarily privileged or protected information.
 

 ¶ 11 Respondent claims "trial by ambush," arguing that the Bar had years to investigate and prepare its case-in-chief while he was afforded insufficient time. Under the Scheduling
 Order, Respondent was to submit his exhibit list by March 30, 2018 and complete discovery by April 6, 2018. The day before his exhibit list was due, Respondent requested an extension of time, to which the Bar agreed. Respondent also requested an extension of the discovery deadline, to which the Bar also agreed. Respondent, however, failed to comply with either extended deadline, and the Bar moved to preclude any documents Respondent sought to introduce at trial. Despite the Bar's motion, the Trial Panel permitted Respondent to submit an exhibit list as well as any documentary evidence by April 20, the Friday before the hearing was scheduled to begin on Monday, April 23. When the Trial Panel ordered him to respond to the many motions to quash filed by the witnesses he subpoenaed, Respondent complained that he could not possibly respond in the time allotted, which was the same amount of time he allowed for his intended witnesses to comply.
 

 ¶ 12 Additionally, Respondent claims the Bar's exhibits were not adequately identified. The record reveals that the Bar made its exhibits available to Respondent on April 6, 2018, in accordance with the Scheduling Order. Respondent, however, did not retrieve them until April 10; then at the hearing nearly two weeks later, the Bar had to assist Respondent in cutting open the exhibit boxes for the first time. Hr'g Tr. vol. 1, 88-90, Apr. 23, 2018.
 

 ¶ 13 The Bar states that Respondent had ample time to prepare a defense against the allegations of the Complaint, and he "engaged in every possible action to subvert the truth and delay the proceedings." The Trial Panel reports that despite receiving sufficient notice and opportunity, Respondent spent much of the hearing giving "frequent soliloquies advancing his theories of extraordinary persecution of him and bias by the bench and [B]ar." Trial Panel Rep. 5. Compliance with due process simply requires that the Bar allege facts sufficient to put the attorney on notice of the charges and allow an opportunity to respond to the allegations.
 
 State ex rel. OBA v. Giger
 
 ,
 
 2003 OK 61
 
 , ¶ 14 n.17,
 
 72 P.3d 27
 
 , 34 n.17 (citing
 
 State ex rel. OBA v. Johnston
 
 ,
 
 1993 OK 91
 
 , ¶ 19,
 
 863 P.2d 1136
 
 , 1143 ). Thorough review of the record reveals that Respondent's allegations of due process violations are without merit.
 

 C. Burden of Proof
 

 ¶ 14 RGDP 6.4 mandates that if the respondent fails to answer the complaint, "the charges
 
 shall
 
 be deemed admitted." 5 O.S.2011, ch. 1, app. 1-A (emphasis added). Once allegations are deemed admitted, evidence "shall be submitted for the purpose of determining the discipline to be imposed."
 
 Id
 
 .;
 
 see also
 

 State ex rel. OBA v. Mirando
 
 ,
 
 2016 OK 72
 
 , ¶ 23,
 
 376 P.3d 232
 
 , 239-40 ;
 
 State ex rel. OBA v. Smith
 
 ,
 
 2016 OK 19
 
 , ¶ 27,
 
 368 P.3d 810
 
 , 815 ;
 
 State ex rel. OBA v. Trenary
 
 ,
 
 2016 OK 8
 
 , ¶ 15,
 
 368 P.3d 801
 
 , 807 ;
 
 Knight
 
 ,
 
 2015 OK 59
 
 , ¶ 19 n.16, ¶ 22 n.24, 359 P.3d at 1128 n.16, 1130 n.24. Nonetheless, admissions must be supported in the record; therefore, we still review the entire disciplinary proceeding, including the merits of the complaint, motion to deem allegations admitted, exhibits, stipulations, pleadings, and Trial Panel report.
 
 Knight
 
 ,
 
 2015 OK 59
 
 , ¶ 22, 359 P.3d at 1130 ;
 
 State ex rel. OBA v. Mothershed
 
 ,
 
 2011 OK 84
 
 , ¶ 69,
 
 264 P.3d 1197
 
 , 1223 ;
 
 State ex rel. OBA v. Bolton
 
 ,
 
 1995 OK 98
 
 , ¶ 7 n.11,
 
 904 P.2d 597
 
 , 601 n.11.
 

 ¶ 15 Even when allegations are deemed admitted, the Court will impose discipline only upon finding that clear and convincing evidence was presented demonstrating the misconduct. RGDP 6.12(c);
 
 State ex rel. OBA v. Seratt
 
 ,
 
 2003 OK 22
 
 , ¶¶ 44, 48,
 
 66 P.3d 390
 
 , 397-98. Clear and convincing evidence is evidence sufficient, both in quality and quantity, to produce a firm conviction of the truth of the allegations.
 
 State ex rel. OBA v. Wilcox
 
 ,
 
 2009 OK 81
 
 , ¶ 3,
 
 227 P.3d 642
 
 , 647. To make this assessment, we must receive a record that permits "(a) an independent on-the-record determination of the critical facts and (b) the crafting of an appropriate discipline."
 
 Schraeder
 
 ,
 
 2002 OK 51
 
 , ¶ 6,
 
 51 P.3d at 574
 
 . Here, we received a voluminous record consisting of the transcripts, exhibits, Trial Panel Report, and corpus of pleadings filed. This record is sufficient for our review.
 

 D. Complaint Facts & Findings
 

 ¶ 16 We review the counts in the Complaint not by numerical order, but rather by conduct increasing in severity. References are to the numbers assigned in the Complaint; we note that the Complaint did not contain a "Count X."
 

 1. Failures to Respond to Requests for Information
 

 ¶ 17 In the following four counts, we address Respondent's refusals to provide requested information to the Bar - in two instances reasonably, and in two others in violation of the rules.
 

 Count IX: Failure to Cooperate with Bar's Request for Medical Information
 

 ¶ 18 Investigating grievances filed against Respondent that appeared to be similar to his misconduct in the prior discipline, the Bar e-mailed Respondent on March 30, 2016, requesting that he provide any and all information regarding current medications, prescribed medications, healthcare providers, and mental and physical diagnoses. Bar Ex. 139C. The Bar explained in this correspondence that it sought this information based on a concern that Respondent's physical and/or mental health might again be affecting his practice of law.
 

 Id.
 

 Over the next year, Respondent refused to provide the requested information, asserting that those records were confidential.
 

 ¶ 19 After opening a formal investigation, the Bar deposed Respondent on March 22, 2017, wherein Respondent agreed to answer questions regarding his health status and produce the requested documentation if the Bar would agree to a protective order limiting the use and disclosure of that information. The Professional Responsibility Commission denied Respondent's request on September 22, 2017. Bar Ex. 142. The Bar submits that Respondent's request and noncompliance were unreasonable because Bar investigations remain confidential under RGDP 5.7.
 
 [3]
 
 The Trial Panel concluded that Respondent's demand for a protective order was properly refused because "Respondent himself had raised the issue" as mitigation in the 2013 discipline, and because the prior and current grievances were so similar. Trial Panel Rep. 10.
 

 ¶ 20 Although Respondent originally inserted his health diagnosis as mitigation in the prior discipline and attested he would continue treatment, we believe those statements were in line with a conditional waiver and relate only to those proceedings. Under title 43A, section 1-109 of the Oklahoma Statutes, mental health treatment information is considered confidential and privileged. The Bar notes the confidentiality of investigations under RGDP 5.7, but seems to ignore that formal complaints and all filings with respect thereto are public records under RGDP 6.1.
 
 [4]
 
 Likewise, while proceedings under RGDP 10 typically remain confidential, RGDP 10.12
 
 [5]
 
 makes an exception where disciplinary proceedings are involved. Further, we do not believe RGDP 10.4
 
 [6]
 
 applies because Respondent did not interject his mental health as mitigation here. Accordingly, while Respondent's refusal to submit medical records foreclosed the possibility of the Bar proceeding
 under Rule 10,
 
 [7]
 
 we do not find that such a refusal amounts to professional misconduct under the circumstances.
 

 Count I: Pike Grievance
 

 ¶ 21 In December 2014, Dorothy Pike hired Respondent to represent her great-grandson (Client) in a first-degree murder case and paid Respondent a $15,000 retainer fee. Pike terminated Respondent in March 2015, and hired new counsel. On March 25, 2015, Respondent faxed Pike's replacement counsel, stating that he would like to meet and go over the work performed in Client's case and that he was "[h]appy to write a check." Bar Ex. 14. The next day, replacement counsel responded that he did not believe it was necessary to meet with Respondent or to discuss any work performed.
 
 Id
 
 . Five days later, replacement counsel followed up, asking Respondent about the status of a refund check.
 
 Id
 
 .
 

 ¶ 22 Pike filed a grievance against Respondent on June 3, 2015, alleging Respondent had promised yet failed to refund $10,000 of her retainer fee. On June 10, the Bar notified Respondent of the grievance and requested a written response within twenty (20) days, pursuant to RGDP 5.2. Respondent timely replied on June 26, 2015, stating that he did not recall ever agreeing to refund $10,000, but would be willing to return a reasonable amount as a good-faith courtesy since Pike was related to his former wife. Bar Ex. 4. Respondent claimed that he had earned more than the $15,000 retainer prior to his termination, and he included a partial billing record for December 3 through December 29, 2014.
 
 Id
 
 . In this partial record, Respondent showed he had worked 67.5 hours at a rate of $250.00/hour and incurred costs of $77.00 in mileage to visit Client in jail. Based on these records, Respondent claimed Pike actually owed him $1,450.39. Respondent also claimed that the $15,000 was only a partial payment of an originally agreed upon retainer fee of $30,000.
 

 ¶ 23 The Bar then made multiple requests for a copy of the case file and a full accounting of work performed for the remainder of his representation. Respondent did not provide the additional information, repeatedly asserting that he was unable to comply due to his computer being broken and undergoing repair. Neither Respondent nor Pike provided a copy of any billing agreement, and at the hearing Pike testified that one did not exist. Pike further testified that although she had paid Respondent $15,000, he was handling the case
 
 pro bono
 
 and charging only for things that cost him money, such as a lie detector test and a rehabilitation program for Client. Hr'g Tr. vol. 2, 418-19, Apr. 24, 2018. Pike admitted that after she terminated Respondent, he never told her an exact amount for the refund he allegedly promised. The Bar's investigator testified that this Count was pursued because he didn't believe that Respondent did the work reflected in his submitted bill. Hr'g Tr. vol. 1, 177-78, Apr. 23, 2018. The Trial Panel found clear and convincing evidence that Respondent failed to respond to the Bar's requests for a full accounting of work performed and failed to refund the unearned portion of the fee.
 

 ¶ 24 RGDP 1.4(b) provides that controversies regarding fee amounts shall not be a basis for disciplinary charges unless the fee "is extortionate or fraudulent." 5 O.S.2011, ch. 1, app. 1-A. Respondent timely responded to the Bar with a partial accounting of work performed, showing that no refund was due. Despite the allegations, the Trial Panel did not permit Respondent to put on evidence supporting the reasonableness of his fee or the time he billed. Further, after his termination, Respondent offered to meet with replacement counsel and go over the work he performed. It is not apparent in the record that after turning down Respondent's offer, replacement counsel ever asked Respondent for a copy of the file. The record suggests confusion surrounding Respondent's willingness to issue a good-faith refund - a refund which does not actually appear to be required. Accordingly, we do not find clear and convincing evidence of professional misconduct regarding the fee disagreement or Respondent's
 failure to provide additional requested information.
 

 Count VI: Withdrawn Grievance
 

 ¶ 25 In May 2016, the Bar received a client grievance alleging that Respondent had accepted a $3,000 retainer fee to set up a trust for the client, yet Respondent failed to perform any services and soon ceased all communication with him. The Bar informed Respondent of the grievance by letter on May 18, 2016, detailing the allegations and requesting his written response within twenty (20) days. Respondent failed to provide a timely response, and the Bar made numerous additional requests for information via certified mail, e-mail, and telephone. Bar Ex. 95.
 

 ¶ 26 It was not until September 21, 2016, four months after the Bar's initial inquiry, that Respondent sent a letter stating his computer was broken, and he was therefore unable to retrieve the requested information. He then stated that he had "worked extremely hard on a myriad of issues," and what existed was a fee dispute. Bar Ex. 96. Before the Bar filed its formal Complaint, the client informed the Bar that the concern had been resolved, and he no longer wished to pursue the grievance against Respondent. The Trial Panel did not find sufficient evidence to support Count VI. We agree as to the underlying grievance but disagree as to Respondent's failure to timely respond. We find clear and convincing evidence that Respondent failed to respond to the Bar's lawful demand for information in Count VI.
 

 Count XII: Misconduct in a Deprived Child Case
 

 ¶ 27 Count XII arises from a juvenile proceeding in which Respondent represented the foster parents of a young child. In March 2017, Respondent filed pleadings wherein he attached confidential medical reports containing protected information about the biological parents and the child, plus a confidential report from the Oklahoma Department of Human Services, which was addressed to the District Attorney's Office. Finding that neither the foster parents nor Respondent should have ever had access to said reports, the district court ordered that all such confidential information contained in Respondent's pleading be immediately "removed and sealed." Bar Ex. 153G;
 
 see also
 
 Hr'g Tr. vol. 7, 1768, May 1, 2018. The court further ordered that Respondent turn in all records that he or his clients "obtained through unknown sources." Bar Ex. 153G.
 

 ¶ 28 Despite repeated requests during the Bar's investigation, Respondent failed to address how he obtained these confidential documents. Instead, he requested recusal of Bar counsel, alleging "flagrant constitutional violations and knowing purposeful harassment." Bar Ex. 152. Respondent claimed the grievance should be dismissed because "no sanctions were imposed by the court."
 
 Id
 
 . At the Trial Panel hearing, both the presiding juvenile court judge and the trial judge testified that Respondent's possession and use of these reports were improper. Hr'g Tr. vol. 7, 1768, 1772-76, May 1, 2018. No authority, however, was cited for that position. The Trial Panel stated that the "real issue in this Count" was how Respondent came into possession of the documents. At no point has Respondent answered that question. We find clear and convincing evidence that Respondent failed to respond to requests for information in Count XII. Overall, Respondent did not commit professional misconduct in Counts I or IX; however, he failed to respond to the Bar's investigation in Counts VI and XII in violation of ORPC 8.1(b)
 
 [8]
 
 and RGDP 5.2.
 
 [9]
 

 2. Lack of Candor, Frivolous Filings, and Dilatory Practices
 

 Count III: Goodwin & Lee Grievance
 

 ¶ 29 Count III relates to Respondent's conduct in
 
 RCB Bank v. Bednar
 
 , No. CJ-2015-192 (Okla. Cty. Dist. Ct.), a foreclosure action which arose from a delinquent loan that Respondent and his former wife executed with RCB Bank. The bank filed its petition on January 13, 2015, seeking judgment for breach of contract, foreclosure on a mortgage, and fraudulent inducement - alleging Respondent made knowingly false statements regarding his income and suspended status as a lawyer at the time of his loan application. Respondent failed to answer the petition until nearly two months later on March 11, 2015. He sought additional time from the court to answer, yet violated that allowance as well. On the day the bank's motion for summary judgment was scheduled, almost eight (8) months after filing his answer, Respondent filed counterclaims without receiving leave to do so. On that same day, Respondent sought the recusal of Judge Prince in open court,
 
 [10]
 
 failing to comply with District Court Rule 15.
 
 [11]
 

 ¶ 30 Following this request for recusal, attorneys for the bank, Kyle Goodwin and Edward Lee, filed a grievance against Respondent on November 30, 2015. In whole, the grievance alleges Respondent's: (1) routine failure to remit copies of pleadings he filed; (2) abusive discovery tactics; (3) failure to follow elementary rules of civil procedure; (4) bad-faith strategy of seeking recusal of judges on the eve of court dates; and (5) general unfitness to practice law. After being notified of the grievance in June 2016, Respondent failed to respond timely. In his response over three (3) months later, Respondent did not disclose relevant facts surrounding the incident; instead he pointed to the conduct and personality of his accuser, Goodwin. The Bar notified Respondent that his response did not comply with RGDP 5.2, and Respondent later filed an untimely supplemental response in which he continued to lodge personal attacks and shift the blame for the drawn out litigation.
 

 ¶ 31 Judge Prince ultimately agreed to recuse, and the case was reassigned to Judge Andrews. The bank filed an Application for Writ of Assistance to remove Respondent from the foreclosure property, and a hearing was set for February 2, 2017. Just two days before the hearing, Respondent filed a motion for recusal of Judge Andrews as well. Judge Andrews overruled Respondent's motion, and a week later Respondent filed yet another motion for recusal, raising essentially the same arguments.
 

 ¶ 32 The record reveals that Respondent conducted abusive and harassing discovery in the proceeding. He demanded production of, among other things, a comprehensive list of the bank's assets; insurance policies for the bank; personal insurance policies for the bank president and its attorneys; and all e-mails and text messages that referenced Respondent
 in any way,
 
 including those Goodwin had with his client, RCB Bank.
 

 [12]
 
 Additionally, Respondent sued RCB Bank, its president, other bank employees, and its attorneys personally in
 
 Bednar v. RCB Bank
 
 , No. CJ-2016-4321 (Okla. Cty. Dist. Ct.).
 

 ¶ 33 Respondent provided Goodwin with documents he purports are "exculpatory e-mails" in which he accurately disclosed his income and suspension. He claims unfairness based on lack of discovery of these e-mails and Goodwin's failure to investigate them. Lodging these claims, Respondent makes virtually no citation to the record. Testimony and exhibits presented at the hearing clearly demonstrate these contentions are false.
 

 ¶ 34 The bank did in fact investigate Respondent's fraud in failing to disclose his true income and suspension. Goodwin testified that the copies of "e-mails" that Respondent provided to him lacked the time and date stamp automatically generated in every e-mail sent from an RCB e-mail account. Likewise, after searching, Goodwin found no record of the purported e-mails outside the copies Respondent provided him. Goodwin stated it was his belief that Respondent manufactured the documents in a "Hail Mary" effort to conceal his fraud on the bank. The Trial Panel concluded that the purported e-mails lacked authenticity. We agree.
 

 ¶ 35 Further, in his briefing to this Court, Respondent misrepresents the testimony of Judge Andrews at the evidentiary hearing. Respondent claims Judge Andrews admitted to error justifying his recusal request when in fact Judge Andrews testified that he believed there was no good-faith basis for Respondent's request and that it was generally a delay tactic.
 
 [13]
 
 The Trial Panel concluded that Respondent "used every trick in the book, and some not in the book, to stall and prevent the action." Trial Panel Rep. 7. Exhibits presented, as well as the testimony of Goodwin and Judges Prince and Andrews, convince us that Respondent intentionally delayed the lawful foreclosure of his home. The record is replete with examples of Respondent's lack of candor, abusive discovery tactics, bad-faith delay attempts, and strategy of improperly seeking the recusal of judges. We find clear and convincing evidence that Respondent committed professional misconduct in Count III.
 

 ¶ 36 The remainder of Counts addressed in this section - Counts IV, V, VIII, and XI - came about as a result of the Bar's investigation into other allegations of misconduct. Respondent disputes the legitimacy of these grievances, arguing they did not arise from any "identified human being." Under RGDP 5.1(a), however, the Bar may "in [its] discretion, institute an investigation on the basis of facts or allegations ... brought to their attention in any manner whatsoever." 5 O.S.2011, ch. 1, app. 1-A. Throughout the proceedings, Respondent requested that counsel for the Bar recuse herself, claiming she was conspiring with other attorneys and subtly encouraging Bar complaints against him. Evidence of Respondent's actions in these cases and comprehensive review of the Bar's investigation into them demonstrate these Counts are not the product of an antagonistic prosecutor as Respondent claims.
 

 Count VIII: Frivolous Lawsuits Against Judges
 

 ¶ 37 On April 13, 2016, Respondent filed a petition in Oklahoma County District Court against Judges Barbara Swinton, Aletia Timmons, and Thomas Prince for intentional infliction of emotional distress.
 

 Bednar v. Hon. Barbara Swinton
 
 , No. CJ-2016-1923 (Okla. Cty. Dist. Ct.). Respondent alleged the judges abused their offices and violated judicial canons by "targeting" and "publicly humiliating" Respondent. After filing his petition, Respondent failed to serve any of the three judges as defendants. Learning about the lawsuit on their own, each of the judges moved to dismiss the case on June 8, 2016, through private counsel and the Attorney General's Office, based on failure to state a claim and judicial immunity.
 

 ¶ 38 Respondent was mailed a copy of these motions and notice of the date, time, and location of the hearing on the motions, which was set for July 14, 2016. Respondent failed to file any timely response to the motions to dismiss. On the date of the hearing,
 
 Respondent failed to appear or to provide the court with any notice or explanation for his lack of appearance
 
 . Granting the judges' motions to dismiss with prejudice on July 14, 2016, the district court stated:
 

 [Respondent] has shown a complete lack of respect to this court by failing to appear without any communication with the court whatsoever. The Court Clerk of Oklahoma County is hereby ordered to contact by certified mail [Respondent] and order him to appear before this court within thirty days and explain why he should not be sanctioned.
 

 Bar Ex. 138M.
 

 ¶ 39 Then on August 15, 2016, Respondent filed a Motion to Set Aside Dismissal With Prejudice, claiming that dismissal was premature because he "had not commenced his case and had not served the petition." Denying the motion on October 20, 2016, the district court plainly held: "In a single sentence
 
 12 O.S. 2003
 
 says otherwise." Bar Ex. 138U. The court then cited the statute directly: "A civil action is commenced by filing a petition with the court." 12 O.S.2011, § 2003.
 

 ¶ 40 On October 10, 2016, Respondent filed an Amended Petition in which he tried to add an additional judge-defendant
 
 after the lawsuit had been dismissed with prejudice
 
 . On November 23, 2016, Respondent filed a Motion to Reconsider. The court denied both by letter, stating that all pleadings by Respondent were improperly filed, and his attempt to revive the litigation by "changing the Heading and adding an additional Defendant" was done "without permission of this Court." Bar Ex. 138X.
 

 ¶ 41 The Bar opened its investigation by letter on January 13, 2017, and Respondent failed to comply with multiple requests for information. On February 13, 2017, the Bar subpoenaed Respondent for deposition on March 2, 2017. One day before the deposition, Respondent e-mailed the Bar investigator, claiming that the case against the judges was "on-going" and it was wrong for the Bar to punish him for "exercising his right to access the courts." Respondent was eventually deposed on March 22 and June 7, 2017. The Trial Panel summarized:
 

 Perhaps the most telling fact in this grievance, though there are many, is Respondent's refusal, when deposed, to provide information as to the allegedly meritorious nature of his claims of slander. He refused to answer based on attorney-client privilege even though he is
 
 pro se
 
 .
 

 Trial Panel Rep. 9.
 

 ¶ 42 Respondent's actions stemming from Count VIII "show the continued abuse of process, ... disregard for court rules and orders, renaming pleadings requesting the same relief, [and] filing pleadings after a case has been dismissed." Trial Panel Rep. 9. We find clear and convincing evidence that Respondent committed professional misconduct in Count VIII.
 

 Count IV: Improperly Seeking Recusal, Impugning the Integrity of the Judiciary, Attempting to Disguise Same Legal Requests with Different Titles & Count V: Abusive Discovery Tactics and Unauthorized Contacts
 

 ¶ 43 Counts IV and V arise from several cases in various district courts. In support of these counts, the Bar submitted numerous exhibits as well as the testimony of Judges Bernard Jones, Aletia Timmons, Barbara Swinton, Thomas Prince, Don Andrews, Martha Oakes, Howard Haralson, Retired Judge Gary Miller, and attorneys Chris Harper and Kyle Goodwin. Testimony of these individuals as well as a bevy of court pleadings demonstrate that Respondent routinely
 engaged in a continuous pattern of filing frivolous motions and improperly seeking the recusal of judges on the eve of, or directly after, adverse rulings.
 
 [14]
 
 Case by case, the Complaint shows how Respondent utilized this strategy as a "procedural weapon designed to run up litigation costs and delay the effect of judgments entered." Complaint ¶ 67.
 
 [15]
 
 ¶ 44 The record confirms that on over thirty (30) occasions in the five (5) cases presented by the Bar, Respondent filed essentially the same motions for reconsideration, motions to vacate, or requests for recusal after a ruling had already been made.
 
 [16]
 
 Court filings and the testimony regarding each of these cases illustrate Respondent's efforts to saturate the court dockets, frustrate the litigation, and prolong the proceedings. At the evidentiary hearing, Judge Haralson concluded:
 

 The way it continued on and on and on ... it wasn't anything that happened by accident[;] it wasn't anything that happened by mistake; it was a very calculated and very continued way of behavior that is absolutely inappropriate for a licensed attorney in the state of Oklahoma.
 

 Hr'g Tr. vol. 7, 1837, May 1, 2018. Respondent's attempts to take a second, third, or fourth bite at the proverbial apple imposed burdensome costs on courts, opposing parties, and his clients. His pattern of misconduct impugns public confidence in an impartial judiciary. We find clear and convincing evidence that Respondent committed professional misconduct in Counts IV and V.
 

 Count XI: Misrepresentations to Judge Parrish
 

 ¶ 45 Count XI stems from Respondent's representation of a family in a wrongful death suit in Oklahoma County. The merits of this lawsuit purportedly turned on the medical opinion of Dr. Chestnut, who had since retired and moved to Norway. After Respondent represented that he had no way of contacting this key witness, opposing counsel spent thousands of dollars locating and serving Dr. Chestnut in Norway to obtain his deposition. Bar Ex. 146. After much discussion and difficulty among the parties, the district court ordered that Dr. Chestnut's deposition would take place on December 8, 2015, when Dr. Chestnut was scheduled to return to Oklahoma for a medical procedure.
 

 ¶ 46 On the day the witness was to be deposed, however, Respondent filed a motion to quash, wherein he misrepresented to the district court that he had never received notice of the deposition from opposing counsel, and based on this lack of notice he was unable to attend. Relying on Respondent's statements, the court struck the deposition.
 
 Id
 
 . It was later established that Respondent had in fact been notified of the deposition and had even exchanged several e-mails with opposing counsel attempting to reschedule it. After the witness did not appear for deposition, opposing counsel filed a motion for sanctions against Respondent.
 

 ¶ 47 During this time period, two separate purported orders quashing the deposition came to light. Bar Ex. 149G, 189. The first merely struck the deposition, whereas the second bore additional language regarding another witness. Calvin Sharpe, attorney for Dr. Chestnut, testified at the Trial Panel hearing that Respondent had shown up at his law firm on the day the deposition was quashed, while Sharpe was in court, and instructed Sharpe's legal assistant to fax the nonconforming, second order to all other parties. Hr'g Tr. vol. 7, 1714, 1718-19, May 1, 2018. Respondent later admitted that he created the second order. Bar Ex. 149L.
 

 ¶ 48 In February 2015, the district court, Judge Parrish presiding, found that Respondent had intentionally misrepresented facts and withheld information from the court. Based on these misrepresentations, Judge Parrish ultimately recused herself permanently from any future cases with Respondent, stating:
 

 I do not trust what you have told me and what you failed to tell me in your motion to quash. My ruling is going to be, Mr. Bednar, I will not hear any cases of yours from this point forward, because it would not be fair to your client because I will not take at face value anything you tell me. ... I feel like you might be misrepresenting or not putting in all the information.
 

 Bar Ex. 149L. Judge Parrish testified that she has never before and has "never since" found it necessary to enter such an order. Hr'g Tr. vol. 7, 1701, May 1, 2018.
 

 ¶ 49 In his response to the Bar's investigation, Respondent denied any professional misconduct, relying on the fact that "no sanctions were imposed." He fails to mention, however, that opposing counsel's motion for sanctions was ruled moot due to the case later settling. The Trial Panel reports that over the course of the hearing, Respondent "sought to justify his deception by all manner of explanations." Trial Panel Rep. 11. Regarding the two court orders, the Panel concluded that it "is of the firm belief that the Respondent falsified this second [o]rder and requested an employee of the opposing counsel to fax it to others from that fax machine."
 
 Id
 
 . We agree. We find that e-mail records, the transcripts from proceedings on December 19, 2014 and February 3, 2015, and the testimony of Judge Parrish and two attorneys provide clear and convincing evidence that Respondent committed professional misconduct in Count XI.
 

 ¶ 50 Respondent has abused the legal system, wasted court resources, and sought to impugn public confidence in the judiciary through deceptive and dilatory tactics employed in Counts III, IV, V, VIII, and XI. The Trial Panel concluded:
 

 The evidence in this matter demonstrates clearly and convincingly that Respondent uses his license to practice law to bully and sue anyone whom he perceives might be talking badly about him or know about his prior relationship with a sitting judge, or try to force a recusal, or perhaps just to be mean. The record reflects that he files frivolous and abusive lawsuits but often neglects to have many of the hapless defendants served. He routinely engages in discovery practices which, intentional or not, harass and intimidate. The single thread in the cases and instances which are the subject of the Complaint and as to which there is overwhelming evidence before the [Trial Panel] is that there are few true facts to support the utter lack of supportive law.
 

 Trial Panel Rep. 2-3. We find Respondent committed professional misconduct in Counts III, IV, V, VIII, and XI in violation of
 ORPC 1.1,
 
 [17]
 
 1.3,
 
 [18]
 
 3.1,
 
 [19]
 
 3.2,
 
 [20]
 
 3.3,
 
 [21]
 
 3.4,
 
 [22]
 
 4.4(a),
 
 [23]
 
 8.1(b), 8.2(a),
 
 [24]
 
 8.4(c)-(d),
 
 [25]
 
 and RGDP 1.3
 
 [26]
 
 and 5.2.
 

 3. Fraud & Misrepresentation to the Court
 

 Count II: Taylor Grievance
 

 ¶ 51 In October 2015, Client hired Respondent to represent her in an emergency guardianship action regarding her newborn granddaughter who was located in Washington state. Previously, Client employed another attorney, Shannon Taylor, in a separate guardianship case regarding another grandchild. Not having sufficient funds to rehire Taylor, Client hired Respondent and gave him copies of the Waiver of Notice and Consent for Guardianship forms that Taylor had prepared in the previous case.
 

 ¶ 52 On November 2, 2015, Respondent returned the forms to Client, indicating that he had completed them for the next steps in
 the guardianship action. Immediately noticing Respondent had not even changed the name of the child from the previous case, Client requested that Respondent make the correction. After Respondent made the necessary alterations, the mother and putative father then signed the forms. As required, the mother had her form notarized, but the father, not having a valid form of identification required for notarization, did not. Respondent communicated that the father should simply return the signed form without notarization. The mother's attorney e-mailed the forms to Respondent from Washington, specifically noting that the father's form was signed but had not been notarized. Respondent filed the guardianship petition that same day and filed the waiver and consent forms the following day.
 

 ¶ 53 After being awarded guardianship, Client hired her former attorney, Taylor, to handle the adoption proceedings. While working on the adoption, Taylor noticed that her copy of the waiver and consent from the guardianship was not file-stamped. After obtaining the file-stamped copy, Taylor was surprised to find that the father's consent form was purportedly notarized by Taylor's own legal assistant. Taylor showed the document to her assistant, who denied notarizing the form and confirmed that her seal was safely stored in her office. Taylor surmised that the image of the seal appeared to have been cut and pasted from the waiver and consent forms prepared by Taylor in the previous case - the same forms which Client had given to Respondent.
 

 ¶ 54 On December 1, 2015, Taylor filed a grievance against Respondent, attaching sworn affidavits from Client and Taylor's legal assistant denying any knowledge of or participation in the notarization. In an untimely response, Respondent denied altering the document and claimed instead that it was Client who had perpetrated the fraud. The Trial Panel stated that despite the "inordinate amount of time" that Respondent spent at the hearing blaming his client, he failed to ever address why he would have submitted the documents "when he knew, and had to know, that one of them could not possibly have been signed and notarized in Oklahoma that very day when the person who signed it was physically in Washington State." Trial Panel Rep. 6.
 

 ¶ 55 The Trial Panel summarized Respondent's conduct as "obfuscatory and deceptive," stating it was "of the opinion that the only perjury was that perpetrated by Respondent."
 

 Id.
 

 We are unconvinced by Respondent's attempts to blame his client. At the very least, Respondent was on notice that the form was not properly notarized, and as the attorney on the case, he is responsible for verifying the truth of pleadings he submits. Indeed, Respondent stipulates that he "did not verify their accuracy." Resp't's Br. 13. We find clear and convincing evidence that Respondent committed professional misconduct in Count II.
 

 Count VII: Keeney & Shaw Grievance
 

 ¶ 56 Count VII arises from a guardianship proceeding in which Respondent was hired in April 2016, by the children and grandchildren of Ward, an incapacitated adult. George Keeney, a certified public accountant and financial and forensics fraud examiner, was appointed co-guardian of Ward's estate and substitute trustee of Ward's trust. As one of his first actions in the case, Respondent called Keeney and attempted to interrogate him about Ward's finances. Declining to discuss the matter, Keeney informed Respondent he was represented by an attorney, James Shaw, and that Respondent should direct all questions to him. Keeney informed his attorney of the interaction, who then called Respondent directly and advised that he represented Keeney and all future communications should be directed to him, not his client.
 

 ¶ 57 A few weeks later, Respondent appeared unexpectedly in a conference call with co-guardians of Ward and the Ward's health care provider, Synergy. During this call, Respondent again tried to question Keeney and others regarding Ward's finances and other health care issues. Then, on May 6, 2016, Respondent telephoned Keeney again, this time falsely representing that Shaw had agreed to their communications. Hr'g Tr. vol. 6, 1321-22, 1324-25, Apr. 30, 2018. Shaw later e-mailed Respondent the following: "Mr.
 

 Bednar, I represent George Keeney, which you know. Do not communicate with him. Any communication for him should be directed to me as his counsel." Bar Ex. 108B. Despite this explicit instruction, Respondent continued to attempt communications via phone and e-mail, requesting financial records and threatening to sue Keeney and others if they did not comply.
 
 [27]
 
 Bar Ex. 108C-F.
 

 ¶ 58 Over the next two months, Respondent filed numerous pleadings which served only to harass opposing counsel and inflate legal costs imposed on Ward's estate.
 
 [28]
 
 On May 6, 2016, he filed for an Emergency Hearing during which he threatened to sue attorney and co-guardian Sara Murphy for "bad mouthing" his clients and announced he would sue the health care provider, Synergy. The district court ordered that Synergy was not to be terminated without further order of the court. Bar Ex. 133M.
 
 The next day, Respondent and his clients violated the district court's order
 
 and terminated Synergy, leaving Ward in a medically vulnerable position.
 
 [29]
 

 ¶ 59 After terminating Synergy, Respondent demanded that Keeney issue a check for $3,500 to pay for a replacement health care company. Shaw advised Respondent by e-mail that "Keeney had no input into the termination of Synergy" and would agree to provide the payment "based solely on his concern that without providing the payment, Ward would be without necessary care due." Respondent then falsely represented to the district court that Keeney had approved the replacement health care company. The same day that Respondent demanded payment from Keeney, Shaw again e-mailed Respondent requesting that all communications between lawyers for the parties be restricted to counsel. Bar Ex. 116. Despite this reiterated request, Respondent continued to e-mail Keeney - threatening defamation suits and claiming Keeney had no authority to perform the work he was hired to do.
 

 ¶ 60 On May 25, 2016, Keeney filed a grievance against Respondent, and on May 31, 2016, Shaw filed a separate grievance. On May 27, 2016, Respondent filed a civil suit against Keeney, Murphy, and Synergy on behalf of his clients and Ward's estate. Bar Ex. 134A-B. The Bar advised Respondent of Keeney's and Shaw's grievances by letter dated June 15, 2016, and requested his written response within twenty (20) days. Respondent failed to respond to either grievance for nearly three (3) months.
 

 ¶ 61 In his response, Respondent stated that he had "not violated any ethical duties or statutes" and asked the Bar to dismiss both complaints based on "lack of standing." Bar Ex. 103. Regarding Keeney's grievance, Respondent denied any wrongdoing and suggested the complaint was likely just a result of his attorney advising him to do so. Respondent lodged accusations of embezzlement and mismanagement of funds; he claimed Keeney "dubbed" a report from DHS and "admitted to numerous violations of his fiduciary and ethical duties."
 

 Id.
 

 Regarding Shaw's grievance, Respondent denied any wrongdoing and claimed Shaw's complaint was "childish, likely due to conversations he had with the unscrupulous firm Kyle Goodwin belongs to." He continued name-calling, stating that Shaw was "childish" and "unprofessional"
 

 and "has received large sums of money from billing [Ward]'s estate."
 
 Id
 
 .
 

 ¶ 62 At the hearing, the Bar presented e-mail records and testimony from Keeney, Shaw, Murphy, and Judge Welch. The testimony of these individuals demonstrates consistently how Respondent's involvement in the case imposed great financial harm on Ward and elevated the cost of litigation from "modest" to "through the roof." Hr'g Tr. vol. 6, 1337, 1345, Apr. 30, 2018.
 
 [30]
 
 Respondent submitted an hour-and-forty-minute audio recording which he claims disproves the testimony of Keeney and Murphy. Resp't Ex. 3. Respondent failed to authenticate it as required by 12 O.S.2011, § 2901. The Trial Panel concluded:
 

 Of all the grievances mounted against Respondent, these are perhaps the most egregious of the egregious. In both the conduct leading to the grievances as well as in the conduct of Respondent during this part of the PRT hearing, the Respondent is the embodiment of unscrupulous. From his direct disobedience of Judge Welch's clear and unambiguous Order, to his repeatedly knowingly contacting a represented party, to his insistence in the hearing that the Order he disobeyed should not have been entered, to filing abusive and baseless pleadings,
 
 Respondent's conduct is an affront to the [B]ar and indeed to human decency
 
 .
 

 Trial Panel Rep. 9 (emphasis added).
 

 ¶ 63 Throughout the hearing and in his briefing to this Court, Respondent has not once tried to take stock of how his actions in this case were improper. Instead, he shirks all responsibility for the financial and personal harm inflicted on Ward, attempts to justify his unauthorized communications, and continues to argue that the Order he disobeyed was wrong. We find clear and convincing evidence that Respondent committed professional misconduct in Count VII. We find that Respondent's professional misconduct in Counts II and VII violates ORPC 3.3, 3.4, 8.1(b), 8.4(c)-(d) and RGDP 1.3 and 5.2. Further, Respondent violated ORPC 3.1 and 4.2
 
 [31]
 
 with his actions in Count VII.
 

 IV. VIOLATIONS
 

 ¶ 64 Upon careful examination, we find that the record of disciplinary proceedings supports a finding, upon a clear and convincing standard, that Respondent violated ORPC 1.1, 1.3, 3.1, 3.2, 3.3, 3.4, 4.2, 4.4(a), 8.1(b), 8.2(a), 8.4(c)-(d) and RGDP 1.3 and 5.2. Respondent failed to uphold his obligations to cooperate in the grievance process or properly respond to inquires throughout the disciplinary proceeding. He has repeatedly failed to act in good faith, asserted frivolous claims and issues, and demanded irrelevant and oppressive discovery. He has failed to competently represent his clients or to exercise due diligence in verifying the truth of pleadings he submitted. Respondent continually persisted in unauthorized communications with a person represented by counsel after reiterated requests to desist. He lacked candor with the court and failed to make reasonable efforts to expedite litigation or notify defendants in actions he filed. Finally, Respondent submitted fraudulent filings, directly and intentionally misrepresented facts, and knowingly disobeyed a court order. Respondent's behavior is prejudicial to the administration of justice and has caused numerous parties unnecessary pecuniary loss and personal harm.
 

 V. DISCIPLINE
 

 A. Mitigation and Enhancement
 

 ¶ 65 "In fashioning the degree of discipline to be imposed ... the Court shall consider
 prior misconduct where the facts are charged in the complaint and proved and the accused has been afforded an opportunity to rebut such charges." RGDP 1.7. Consideration of prior discipline serves to aid the Court in making its decision and to enhance any discipline to be imposed. RGDP 6.2;
 
 State ex rel. OBA v. Mothershed
 
 ,
 
 2003 OK 34
 
 , ¶ 41,
 
 66 P.3d 420
 
 , 428. The Bar relies on Respondent's discipline in
 
 Bednar I
 
 for enhancement. Respondent argues that enhancement is inappropriate because the 2013 discipline "remains to be investigated." This is wholly inaccurate. We find Respondent's prior discipline to be appropriate for enhancement.
 

 ¶ 66 In
 
 Bednar I
 
 , we declared that Respondent's actions indicated a "disturbing pattern of behavior with a key element being the lack of forthrightness."
 
 2013 OK 22
 
 , ¶ 11,
 
 299 P.3d at 491
 
 . While egregious on their own, Respondent's acts of misconduct today are elevated by his resolute attempts to cover up, shift blame, and deny any form of wrongdoing in the face of clear evidence to the contrary. Although we may consider mitigating circumstances to assess the appropriate measure of discipline,
 
 State ex rel. OBA v. Durland
 
 ,
 
 2003 OK 32
 
 , ¶ 15,
 
 66 P.3d 429
 
 , 432, no such mitigation exists in this record that would cause our judgment to diminish.
 
 [32]
 

 B. Appropriate Discipline
 

 ¶ 67 Appropriate discipline "is that which is (1) consistent with the discipline imposed upon other lawyers who have committed similar acts of professional misconduct and (2) avoids the vice of visiting disparate treatment of an offending lawyer."
 
 Schraeder
 
 ,
 
 2002 OK 51
 
 , ¶ 6,
 
 51 P.3d at 574
 
 . As stated previously, the main purpose of our disciplinary authority is not to punish the offending lawyer, but to safeguard the interests of the public, the courts, and the legal profession.
 
 Friesen
 
 ,
 
 2016 OK 109
 
 , ¶ 8,
 
 384 P.3d at 1133
 
 . Preservation of the public's confidence in the legal system is essential to its success, and such confidence depends on our willingness to impose severe discipline when appropriate.
 
 State ex rel. OBA v. Gassaway
 
 ,
 
 2008 OK 60
 
 , ¶ 80,
 
 196 P.3d 495
 
 , 510. A second purpose of discipline is to deter the attorney from similar future conduct.
 
 State ex rel. OBA v. Godlove
 
 ,
 
 2013 OK 38
 
 , ¶ 22,
 
 318 P.3d 1086
 
 , 1094.
 

 ¶ 68 "A pattern of repeated offenses, even ones of minor significance when considered separately, can indicate indifference to legal obligation." ORPC 8.4 cmt. 2;
 
 Gassaway
 
 ,
 
 2008 OK 60
 
 , ¶ 75,
 
 196 P.3d at 509
 
 . The record shows a pattern of repeated offenses by Respondent, some minor and some egregious. The grievances cover a span of time beginning not long after Respondent was reinstated as an attorney, indicating an indifference to his legal obligation and a lack of deterrence following his prior discipline.
 

 ¶ 69 In
 
 State ex rel. OBA v. Thomas
 
 ,
 
 1995 OK 145
 
 , ¶¶ 7-8,
 
 911 P.2d 907
 
 , 910, we disbarred an attorney who presented a forged "order" to his client in an effort to misrepresent the neglected status of the case and who failed to timely respond to the grievance against him. Thomas admitted to forging the document, but attempted to shift the blame for it being delivered to the client.
 
 Id
 
 . Even though Thomas never actually submitted the forgery to the court, we still found disbarment appropriate, stating: "Fraud and misrepresentation by an attorney toward his client are serious forms of misconduct. Likewise, the forging of legal documents is a serious breach of legal ethics which constitutes illegal conduct involving moral turpitude and justifies imposition of the
 
 most severe discipline.
 
 "
 
 Id
 
 . ¶ 15,
 
 911 P.2d at 913
 
 (emphasis added) (citations omitted). While Respondent did not neglect a client's case like in
 
 Thomas
 
 , he filed a fraudulent notarization, altered other court documents, and directly violated a court order - in each instance blaming his clients or opposing counsel for the resulting harm.
 

 ¶ 70 Perhaps most similar, in
 
 State ex rel. OBA v. Godlove
 
 ,
 
 2013 OK 38
 
 ,
 
 318 P.3d 1086
 
 , we disbarred an attorney for frivolous litigation tactics and discovery abuses. Like Respondent, Godlove failed to respond to grievances or answer the formal complaint against her.
 
 Id
 
 . ¶¶ 4-5,
 
 318 P.3d at 1088
 
 . We found Godlove committed misconduct in at least eighteen cases, where she filed at least twenty-four pleadings collaterally attacking final orders and at least seventeen requests for recusal of judges after adverse rulings.
 
 Id.
 
 ¶¶ 9, 10, 13,
 
 318 P.3d at 1089-90
 
 . Godlove also knowingly disobeyed a direct court order by filing abusive pleadings wherein she would file motions, fail to appear, and then request to vacate the resulting adverse orders.
 
 Id.
 
 ¶ 17,
 
 318 P.3d at 1091
 
 . Evaluating appropriate discipline, we noted Godlove's failure to cooperate with the Bar's investigation and continued misconduct after her former discipline and sanctions.
 
 Id.
 
 ¶¶ 23-25,
 
 318 P.3d at 1094
 
 . We stated:
 

 For the extensive violations of the rules governing lawyers' conduct and for ignoring these proceedings, we find that disbarment is necessary to stop the abuse of the system hailed on it by Godlove's frivolous, multiple, duplicate filings and to end the disservice to her clients, to opposing parties, to opposing counsel, and to judges presiding over cases in which she is involved.
 

 There is a fine line between zealous advocacy and harassing, frivolous litigation. Godlove has not only overstepped the line, she has trampled it. We have a duty to protect against the type of frivolous litigation undertaken by Godlove.
 

 Id.
 
 ¶¶ 26-27,
 
 318 P.3d at 1094-95
 
 . Today we carry out this same duty. As in
 
 Godlove
 
 , Respondent's patterned behavior "has shown a total lack of respect for this Court and the process and rules that protect the public from errant lawyers."
 
 Id.
 
 ¶ 25,
 
 318 P.3d at 1094
 
 .
 
 [33]
 
 Zealous advocacy does not necessitate, nor does it prompt, intimidation or harassment; Respondent has exhibited both in his practice of law.
 

 ¶ 71 We are convinced, under a clear and convincing standard, of Respondent's sustained abuse of the legal system and retaliatory harassment of opposing counsel and the courts. We see no real evidence that Respondent appreciates the seriousness of his fraud and deceit, examples of which saturate the record. He adamantly denies his wrongdoing and attempts to justify some of the most maligning and egregious behaviors the Court has encountered. Our promulgated rules governing licensed attorneys require much more, and in fact, were fashioned to protect the public from this type of delinquency. Anything less than disbarment would invite further victimization and greater disintegration of public confidence in the legal system of this State. Likewise, to avoid disparate treatment, consistency requires that we disbar Respondent.
 

 VI. ASSESSMENT OF COSTS
 

 ¶ 72 The Bar has asked this Court to assess costs in the amount of $28,298.13. RGDP 6.16 provides that where violations are proven, the costs shall be surcharged against the disciplined lawyer unless remitted in whole or in part by the Supreme Court for good cause shown. We have previously held that costs assessed against an attorney may be reduced in part where the Bar fails to prevail on all of the counts charged.
 
 [34]
 

 ¶ 73 Here, Respondent prevailed fully on two of the eleven counts, and in two others, we found violations only in his failure to respond. On the other hand, by filing frivolous, redundant pleadings, attempting to relitigate his prior discipline, and failing to respond to grievances as they were submitted, Respondent's behavior ballooned the costs of the proceedings exponentially. Accordingly,
 we reduce the costs assessed against Respondent to $20,580.48, which shall be paid within ninety (90) days of the effective date of this opinion. RGDP 6.16
 

 VII. CONCLUSION
 

 ¶ 74 Upon
 
 de novo
 
 review, we find clear and convincing evidence of Respondent's professional misconduct in nine of the eleven counts. We order that he be disbarred from the practice of law, his name be stricken from the roll of attorneys, and he pay the costs of this proceeding in the amount of $20,580.48. Pursuant to RGDP 9.1, Respondent is required within twenty (20) days to notify all clients, via certified mail, of his inability to represent them and the necessity to promptly retain new counsel. Respondent is also required to withdraw from all pending cases and file an affidavit stating his compliance with RGDP 9.1 and a list of clients notified with both the Clerk of the Supreme Court and the Professional Responsibility Commission.
 

 RESPONDENT IS DISBARRED AND ORDERED TO PAY COSTS.
 

 Wyrick, V.C.J., Winchester, Edmondson, Reif, Darby, JJ., concur;
 

 Gurich, C.J., Combs, J., recused;
 

 Kauger, Colbert, JJ., not participating.
 

 In this order, the Trial Panel specifically considered our analysis of RGDP 6.4 in
 
 State ex rel. OBA v. Knight
 
 ,
 
 2015 OK 59
 
 , ¶ 20,
 
 359 P.3d 1122
 
 , 1128, stating:
 

 This Tribunal does not discern any public interest relating to the merits of this proceeding which would require deviation from the mandatory language of Rule 6.4, or for consideration of evidence other than that related to determining the discipline to be imposed; provided, however, that in accordance with extant case law, on hearing of this matter, Complainant shall be required to present competent evidence as to each material allegation of the Complaint.
 

 The Trial Panel recounts Respondent's conduct at the hearing as "the exemplification of unprofessional. He was frequently late[,] ... disruptive[,] and argumentative[, and] ... would almost without exception focus his efforts to either justifying his actions giving rise to the violations or attack witnesses personally rather than the witness'[sic] credibility." Trial Panel Rep. 4-5.
 

 "Investigations by the General Counsel and the Commission shall be confidential, and the results thereof shall not be made public until authorized by the Supreme Court or as provided in Rule 6.1." RGDP 5.7, 5 O.S.2011, ch. 1, app. 1-A.
 

 "Upon the expiration of the respondent's time to answer, the complaint and the answer, if any, shall thereupon be lodged with the Clerk of the Supreme Court and the complaint, as well as all further filings and proceedings with respect thereto, shall be a matter of public record." RGDP 6.1, 5 O.S.2011, ch. 1, app. 1-A.
 

 "Except where disciplinary proceedings are involved (Rule 10.4), all proceedings under this Rule 10 shall remain confidential and shall not be a matter of public record, unless otherwise ordered by the Supreme Court." RGDP 10.12, 5 O.S.2011, ch. 1, app. 1-A.
 

 In pertinent part, RGDP 10.4 states: "Whenever in a disciplinary proceeding brought under these rules,
 
 the respondent interposes present mental incompetence as a ground for abating the proceeding,
 
 the Trial Panel ... shall determine whether the respondent is mentally incapable to defend or assist his counsel in defending against the charges." 5 O.S.2011, ch. 1, app. 1-A (emphasis added).
 

 See
 

 State ex rel. OBA v. Leonard
 
 ,
 
 2016 OK 11
 
 , ¶ 25,
 
 367 P.3d 498
 
 , 507 (where attorney similarly foreclosed the Bar's opportunity to prove incapacity under RGDP 10 by refusing to fully disclose medical records).
 

 [A] lawyer in connection with a ... disciplinary matter, shall not: ...
 

 (b) fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority, except that this rule does not require disclosure of information otherwise protected by Rule 1.6.
 

 ORPC 8.1(b), 5 O.S.2011, ch. 1, app. 3-A.
 

 After making such preliminary investigation as the General Counsel may deem appropriate, the General Counsel shall ... file and serve a copy of the grievance (or, in the case of an investigation instituted on the part of the General Counsel or the Commission without the filing of a signed grievance, a recital of the relevant facts or allegations) upon the lawyer, who shall thereafter make a written response which contains a full and fair disclosure of all the facts and circumstances pertaining to the respondent lawyer's alleged misconduct unless the respondent's refusal to do so is predicated upon expressed constitutional grounds. Deliberate misrepresentation in such response shall itself be grounds for discipline. The failure of a lawyer to answer within twenty (20) days after service of the grievance (or recital of facts or allegations), or such further time as may be granted by the General Counsel, shall be grounds for discipline.
 

 RGDP 5.2, 5 O.S.2011, ch. 1, app. 1-A.
 

 [Judge Prince]: So to say it was brought in good faith? He had a legitimate reason, but he waited until the eve of a hearing to ask it. He utilized a tactic I thought was improper by filing a motion to recuse in public prior to filing a Rule 15 -- prior to having a Rule 15 conference. ... [T]he fact that he did it in such a manner that it was
 
 on the eve of a hearing and filed a motion in public prior to having a Rule 15
 
 , it leads me to question motives.
 

 Hr'g Tr. vol. 8, 960-61, May 2, 2018 (emphasis added).
 

 This rule requires that the lawyer make an in camera request before filing any motion to disqualify a judge and provides that "if such request is not satisfactorily resolved, not less than ten (10) days before the case is set for trial[,] a motion to disqualify a judge or to transfer a cause to another judge may be filed." R. for Dist. Cts. of Okla. 15(a), 12 O.S.2011, ch. 2, app.
 

 Regarding the timing of these discovery requests, Goodwin stated:
 

 While under the protective umbrella of Rule 15, Bednar issued the abusive discovery set forth above, knowing that Judge Prince was not free to rule upon either the foreclosure or the discovery issues. ... [T]his conduct evinces Bednar's willingness to abuse both procedures for recusal and the discovery code as a means of staving off adverse decisions.
 

 Bar Ex. 44.
 

 [Judge Andrews]: What I believe is, when you requested my recusal from the case, that that was - there was no good-faith basis for that request. ... I didn't believe there was any bias or prejudice on my part. ... [G]enerally, I think it's - it's a delay tactic. If you ask for recusal, there's a suspension, a stay of all proceedings, so it's a delay tactic. I believe that was your motivation.
 

 Hr'g Tr. vol. 4, 930, 934, Apr. 26, 1018.
 

 Liebel v. Bednar
 
 , No. CJ-2009-11652 (Okla. Cty. Dist. Ct.): Motion To Disqualify Judge (May 19, 2015) (regarding Judge Jones); [Second] Motion To Disqualify Judge (May 20, 2015) (regarding Judge Jones); Supplement To Motion To Reassign Case In Support Of Reassignment Based On Existing Statutes (May 20, 2015) (regarding Judge Jones); Amended Motion To Withdraw Judge Timmons (Aug. 17, 2016) (where court found there was "no evidence that Rule 15 was procedurally followed").
 

 Eaves v. Matthew
 
 , No. CJ-2014-653 (Can. Cty. Dist. Ct.): Special Appearance Of ... Public Adjuster For Plaintiffs In Support Of Motion To Withdraw Saheb, And Notice Of Intent To File Cross Claim Against Freedom Mortgage For Employing His Own Attorney Who Has Taken An Adverse Financial Position ..., And Also Supporting Injunctive Relief Against Freedom Mortgage (July 31, 2015); Motion To Disqualify Judge (Dec. 17, 2015) (regarding Judge Swinton and falsely claiming defamation as well as a physical assault by another district judge); Motion To Strike Judge Swinton's Minute Order Of December 18, 2015 As A Pending Motion To Recuse Was Priorly [sic] Filed And Judge Swinton Was Not Free To Proceed With The Case Until The Challenge To Her Impartiality Was Adjudicated (Jan. 22, 2015); Aid To The Court (Conclusive Evidence Demonstrating Threshold Of The Appearance Of Impropriety Has Been Reached, Supporting Recusal) (Jan. 22, 2016); Motion To Vacate Order Per Court's Inherent Powers Within Thirty Days, And Incorporation By Reference Of Outstanding Motions To Disqualify Judge And To Strike Docket Entry (Mar. 18, 2016); Motion To [sic] Leave To Amend Petition And Add Parties (Mar. 18, 2016).
 

 Turner v. Bray
 
 , No. CJ-2015-272 (Can. Cty. Dist. Ct.): Motion To Withdraw [Defendant's Counsel] For Violations Of Title 5 And Conflicts Of Interest (July 17, 2015); Motion To Set Aside Journal Entry And Response To Motion For Fees (July 17, 2015); Application For Emergency Order To Vacate Default Judgment For Procedural Irregularity (Oct. 23, 2015); Petition To Vacate Default Judgment For Procedural Irregularity (Oct. 30, 2015); Emergency Motion To Halt Defendant's Garnishment As Premature (Nov. 30, 2015); Motion To Disqualify Judge And To Strike Minute Order Of February 5, 2016 (Feb. 9, 2016) (regarding Judge Timmons); Aid To Court Regarding Proposed Order For Motion To Disqualify The Judge (Feb. 16, 2016) (regarding Judge Timmons);
 
 see also
 
 Court Minute (Oct. 23, 2015) (finding Respondent repeatedly delayed the hearing on a motion to compel and disobeyed the earlier court order to produce documents).
 

 Bednar v. Bednar
 
 , No. FD-2014-4499 (Okla. Cty. Dist. Ct): Respondent's Objection And Request To Strike September 21, 2015 Motion And Ex Parte Order Of Same Day For Failure To Include Undersigned In Ex Parte Meeting With Judge, For Misrepresentation To Court, And Procedural Violations (Sept. 23, 2015); Motion To Withdraw Attorney ... From Further Representation As He Has Become A Witness And As His Client Has Divulged His Attorney Communications (Sept. 24, 2015); Motion To Set Aside Decree On Court's Own Motion To Settle And Order Of October 20, 2016 For Violation Of Rule 15 As A Court Is Not To Adjudicate Any Matter Until The Rule 15 Matter Is Exhausted, And To Move This Venue For Forum Non Conveniens (Oct. 31, 2016); Motion To Recuse Judge Haralson Due To Apparent Bias (Oct. 31, 2016); Motion To Reconsider, And For Court to Set Aside Order Pursuant To Its Inherent Powers Within Thirty Days (Dec. 15, 2016); Motion To Recuse Judge Haralson Due To Apparent Bias And To Compel Him Not To Rule On Any Issues Until After Adjudication Of The Rule 15 Matter (Dec. 30, 2015); Supplemental Motion To Recuse, And Support For Forum Non Conveniens (Jan. 4, 2017); Motion To Reconsider (Jan. 10, 2017).
 

 Saheb v. Bednar
 
 , No. CJ-2015-472 (Okla. Cty. Dist. Ct.): Motion To Recuse Judge Swinton And For Administrative Reassignment Pursuant To Rule 15 And Local Rules (Jan. 14, 2016); Supplement To January 14, 2016 Motion To Recuse Judge Swinton (Feb. 19, 2016); Attorney Subpoena For Deposition Of Judge Swinton (Feb. 23, 2016); Aid To The Court In Support Of Special Appearance And Request To Recuse Judge Swinton From All Cases With Mr. Bednar (Feb. 26, 2016); Motion To Reconsider Order Of March 7, 2016 (Apr. 6, 2015) (filed after the case had been dismissed).
 

 Below is an excerpt from the February 5, 2016 hearing in
 
 Turner v. Bray,
 
 No. CJ-2015-272, where Respondent filed vexatious pleadings, asked for Judge Timmons's recusal (following Judge Miller's recusal), and the court granted a $5,000 sanction against Respondent:
 

 The Court: No. No, this is after judgment. You can't intervene after judgment, when judgment has been rendered. So the Motion to Intervene will be denied. ... And we've discussed this, at least, 12 times, because you filed Motions and I said you're post judgment, so these motions should not have been filed.
 

 [Respondent]: Judge, there's --
 

 The Court: Am I correct, Counsel?
 

 [Respondent]: You're correct.
 

 The Court: Okay.
 

 [Respondent]: Judge, just to clarify that history of the case --
 

 The Court: No, I don't need to clarify it. I've pulled the pleadings, I have looked at the docket sheet. I have seen that Judge Miller has ruled on these Motions repeatedly. .. The same Motions, slightly different title, same substance, ruled on over and over and over again.
 

 [Respondent]: Yes. But this time it's different, Judge.
 

 The Court: No, it's not. ... [I]t's clear to me, based on what I have read, that you had a propensity not to serve people with notice of the hearing and then come and say you served them with no proof of that, and then we have to do Motions to Vacate, Motions to Set Aside, because you have not served people. You served the Motion for the subpoena in this case by fax, which is improper. .. [Judge Miller] specifically overruled that. And then you came to Oklahoma County because you requested, or Judge Miller recused because of these pleadings that are flying around that make no sense. ... So then you filed the same Motion in front of me, November 20th, on an emergency, which I told you was not an emergency. It was post judgment. ... I told you that.
 

 [Respondent]: You did, Judge. ...
 

 The Court: So you filed and you set a hearing on it anyway. ... I'm not going to resign or either disqualify myself, because this is another pattern you have of making up disqualification reasons for court personnel, for lawyers, whenever the case is not going your way. I've seen it in four cases. ... There's no evidence, as found by Judge Miller, and again found by me. I find that the continued filing of the same motions in Canadian County and Oklahoma County is vexatious. ... It is a pattern of conduct where you have been warned and sanctioned from one end of Federal Court to State Court on.
 

 Bar Ex. 76QQ.
 

 Regarding Respondent's improper attempt to vacate an adverse court order in
 
 Turner v. Bray
 
 , No. CJ-2015-272, the district court stated:
 

 The motion, which is disguised as an application, was filed by [Respondent] on 10/23/2015. The court had previously admonished [Respondent] to make sure he can do by motion what he is attempting to do by motion and to call it an application doesn't change the fact that it is a motion to vacate.
 

 Bar Ex. 76A. Regarding the numerous pleadings Respondent filed in
 
 Bednar v. Bednar
 
 , No. FD-2014-4499, Judge Haralson testified that at every turn Respondent sought to delay the proceedings:
 

 Absolutely a lot of wasted time and a lot of delay. .. [Respondent] just kept filing new motions to reconsider or motion to vacate, for new trial. It was always the same - - the same material, the same allegations, and it was just - - it was frustrating. It took up time. It took time away from other cases, because we had to schedule time to hear and rehear things that had been heard and reheard. And that's why it became necessary for me to be very specific and enter the length and depth of explanation in the orders that I entered, was because we needed to be clear and try to explain, but it didn't seem to help.
 

 Hr'g Tr. vol. 7, 1834-35, May 1, 2018;
 
 see also
 
 Bar Ex. 81UU.
 

 "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation." ORPC 1.1, 5 O.S.2011, ch. 1, app. 3-A.
 

 "A lawyer shall act with reasonable diligence and promptness in representing a client." ORPC 1.3, 5 O.S.2011, ch. 1, app. 3-A.
 

 "A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous." ORPC 3.1, 5 O.S.2011, ch. 1, app. 3-A.
 

 "A lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client." ORPC 3.2, 5 O.S.2011, ch. 1, app. 3-A.
 

 In pertinent part, ORPC 3.3, 5 O.S.2011, ch. 1, app. 3-A, provides:
 

 (a) A lawyer shall not knowingly:
 

 (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer;
 

 (2) fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client ...
 

 (3) offer evidence that the lawyer knows to be false. ...
 

 (4) fail to disclose a fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client.
 

 (b) A lawyer who represents a client in an adjudicative proceeding and who knows that a person intends to engage, is engaging or has engaged in criminal or fraudulent conduct related to the proceeding shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal. ...
 

 (d) In an ex parte proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer ... whether or not the facts are adverse.
 

 In pertinent part ORPC 3.4, 5 O.S.2011, ch. 1, app. 3-A, provides that a lawyer shall not:
 

 (a) unlawfully obstruct another party's access to evidence or unlawfully alter, destroy or conceal a document or other material having potential evidentiary value. ...
 

 (b) falsify evidence, counsel or assist a witness to testify falsely ...
 

 (c) knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists;
 

 (d) in pretrial procedure, make a frivolous discovery request or fail to make reasonably diligent effort to comply with a legally proper discovery request by an opposing party;
 

 (e) in trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence.
 

 "In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, or use methods of obtaining evidence that violate the legal rights of such a person." ORPC 4.4(a), 5 O.S.2011, ch. 1, app. 3-A.
 

 A lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge, adjudicatory officer or public legal officer, or of a candidate for election or appointment to judicial or legal office.
 

 ORPC 8.2(a), 5 O.S.2011, ch. 1, app. 3-A.
 

 "It is professional misconduct for a lawyer to: ... (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation[, or] (d) engage in conduct that is prejudicial to the administration of justice." ORPC 8.4(c)-(d), 5 O.S.2011, ch. 1, app. 3-A.
 

 In pertinent part, RGDP 1.3, 5 O.S.2011, ch. 1, app. 1-A, provides:
 

 The commission by any lawyer of any act contrary to prescribed standards of conduct, whether in the course of his professional capacity, or otherwise, which act would reasonably be found to bring discredit upon the legal profession, shall be grounds for disciplinary action, whether or not the act is a felony or misdemeanor, or a crime at all.
 

 Regarding these unauthorized communications, Keeney testified:
 

 [T]here were at least 40, if not 50, e-mails, most of which dealt with matters that, to someone who had not had my level of experience, would have been very intimidating, threats of litigation, threats of defamation claims, anticipated litigation against Synergy, against Sara Murphy, against me. Just -- it was just an ongoing onslaught of e-mails that were [sic] totally inappropriate.
 

 Hr'g Tr. vol. 6, 1325-26, Apr. 30, 2018.
 

 E.g.
 
 , Bar Ex. 108A, Motion To Quash Subpoenas And For Protective Order (May 23, 2016) (wherein Respondent falsely represented to the court that Keeney and Shaw threatened the guardians of Ward with criminal prosecution).
 

 Respondent later claimed he "did not understand" the order of the court. Regarding this, Judge Welch testified:
 

 I like Mr. Bednar, I think of him as a friend, so it pained me then and it pains me now to suggest.
 
 He knew what the order of the Court was and he didn't like the order of the Court, and he then proceeded to do what he intended to do in spite of and contrary to the order of the Court.
 

 Hr'g Tr. vol. 5, 1261-62, Apr. 27, 2018 (emphasis added).
 

 Attorney Murphy testified:
 

 [T]here are bad lawyers that don't do research and show up late or don't answer phone calls, but this went above and beyond anything I've ever experienced. This not only was damaging to my practice, it - it took time and money away from all the people involved. But, most importantly, this hurt [Ward,] who was incapacitated and could not make decisions for herself and I believe cost her literally hundreds of thousands of dollars. ... Before [Respondent] got involved, the case was going smoothly. ... [T]he moment he became a part of this, it was pure chaos.
 

 Hr'g Tr. vol. 6, 1611-12, Apr. 30, 2018.
 

 ORPC 4.2 mandates that "a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order." 5 O.S.2011, ch. 1, app. 3-A.
 

 Previously, we considered Respondent's diagnosis as mitigation regarding ORPC 3.2.
 
 Bednar I
 
 ,
 
 2013 OK 22
 
 , ¶ 17,
 
 299 P.3d at 492
 
 . Respondent chose, however, not to provide evidence toward that end; therefore we do not consider it here. Additionally, representing himself as a
 
 pro se
 
 litigant, Respondent is held to the same standard as a licensed attorney.
 
 L'ggrke v. Sherman
 
 ,
 
 2009 OK 80
 
 , ¶ 8,
 
 223 P.3d 383
 
 , 385. Plus, of course, at all times while acting as his own counsel, Respondent
 
 was a licensed attorney
 
 .
 

 We note that, unlike
 
 Godlove
 
 , Respondent participated in the Trial Panel hearing and did not fail to update his address with the Bar. These distinctions, however, do not overcome the abundance of Respondent's additional misconduct -- filing fraudulent pleadings, altering court documents, and directly misrepresenting facts to district courts.
 

 See, e.g.,
 

 Gassaway
 
 ,
 
 2008 OK 60
 
 , ¶¶ 86-87,
 
 196 P.3d at 511
 
 (where we reduced costs after attorney prevailed on nine out of fifteen counts, but we also considered attorney's actions in increasing costs and disproportionate evidence in certain counts);
 
 State ex rel. OBA v. Funk
 
 ,
 
 2005 OK 26
 
 , ¶ 78,
 
 114 P.3d 427
 
 , 441 (where we reduced costs by two-thirds after attorney prevailed on two of three counts);
 
 State ex rel. OBA. v. Israel
 
 ,
 
 2001 OK 42
 
 , ¶ 32,
 
 25 P.3d 909
 
 , 916 (same).